# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | |
|---|---|
| JODY D. HILL ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:12 CV 56 DDN |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Jody D. Hill for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 10.) For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).

## I. BACKGROUND

Plaintiff Jody D. Hill, who was born on April 9, 1977, filed applications for Title II and Title XVI benefits on August 20, 2007. (Tr. 163-70.) He alleged an onset date of disability of February 1, 2006, due to manic depression, homicidal and suicidal tendency. (Tr. 93-96, 209.) Plaintiff's applications were denied initially on October 11, 2007, and he requested a hearing before an ALJ. (Tr. 93-96, 103-04.)

On May 6, 2009, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 75-85.) The Appeals Council granted plaintiff's request for review, and a remanded with instructions on February 26, 2010. (Tr. 86-90.) The alleged onset date was amended to November 24, 2006. (Tr. 30, 203.) The ALJ again denied benefits in a decision dated October 4, 2010. (Tr. 10-19.) The

Appeals Council denied review on February 24, 2012. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On March 5, 1999, plaintiff voluntarily admitted himself into Southeast Missouri Mental Health Center. He was provisionally diagnosed with adjustment disorder. He stated that he was tired of criticism he received from his family and threatened to hurt either his aunt or himself. He stated that he had not received adequate love and support from his mother, and was "always put down by her." He was stressed by his household situation, where he lived with his mother, stepfather, stepfather's children, his aunt, her husband, and their children and stepchildren. He felt worthless and had passive suicidal thoughts. He denied auditory or visual hallucinations. Upon his admittance, plaintiff was given a GAF score of 60 by Bonnie Hartrup, CCA, and Tina Lutes, MSW, SWPI.[1] (Tr. 380-89.)

Physically, plaintiff was well-developed and slender, but had poor hygiene. A neurological examination was "essentially within normal limits." Plaintiff did well at his stay in the health center; "[h]e was social and attended groups without difficulty." Evaluations suggested "chronic personality difficulties characterized by excessive worry, introspection, and overideational rumination." On March 8, 1999, Ms. Hartrup and Ms. Lutes gave plaintiff a GAF score of 65.[2] At his discharge on March 10, plaintiff "was in a good mood and had a bright affect." No medications were prescribed;

---

[1] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
   On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32–34 (4th ed.2000).

[2] A GAF of 61–70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy, or theft within the household), but the individual generally functions pretty well and has some meaningful interpersonal relationships. DSM-IV at 32–34.

Manisha Lele, M.D., did not feel that medications were indicated. Rather, she instructed plaintiff to seek counseling for his anger issues. Dr. Lele gave plaintiff a GAF score of 80.[3] (Id.)

On July 6, 2006, plaintiff saw Keith Myers, a medical intern, for a psychological consultation. Mr. Myers wrote that plaintiff does not require a medical evaluation. Plaintiff reported that he slept between 12 and 16 hour per night, that his mood was depressed and apathetic, and that he was hospitalized in 1999 for wanting to kill his aunt. He was stressed by his relationships with his family and girlfriend, and did not have anyone who completely supported him. Mr. Myers diagnosed plaintiff with moderate recurrent major depressive disorder and gave plaintiff a GAF score of 51. (Tr. 276-77.)

Mr. Myers conducted a psychological evaluation of plaintiff on July 10, 2006. Plaintiff complained of frustrations with his job and his girlfriend. Mr. Myers marked that plaintiff had an appropriate affect, mood, and behavior. His insight and judgment were fair, and eye contact was poor. His thought process was noted as "loose association." He was marked as not a danger to himself or others. (Tr. 275.)

Also on July 10, 2006, plaintiff saw Judith Haggard, MS, APRN, BC for a follow-up examination regarding his depression, expressing a desire for medication. Ms. Haggard noted that plaintiff seemed bitter and avoided eye contact. She prescribed Celexa and a follow-up appointment in two weeks.[4] (Tr. 285, 349.)

On July 24, 2006, plaintiff saw Ms. Haggard again. He reported that the Celexa was helping and that "everybody notices a difference." He was no longer angry and felt much better. Ms. Haggard noticed that he seemed more pleasant and was much more willing to make eye contact. She instructed him to continue on Celexa and to return in three months. (Tr. 284, 347.)

On August 7, 2006, plaintiff saw Muhammad Salmanullah, MD, as a condition for his employment. Dr. Salmanullah wrote that he does not have suicidal ideations, but that he should

---

[3] On the GAF scale, a score from 71–80 indicates that symptoms, if any, are transient and expectable reactions to psycho-social stressors (such as difficulty concentrating after a family argument) and no more than a slight impairment in social, occupational, or school functioning. DSM-IV at 32–34.

[4] Celexa is an antidepressant medication. WebMD, http://www.webmd.com/drugs (last visited August 12, 2013).

continue taking Celexa.  (Tr. 283, 345.)

On December 6, 2006, plaintiff saw Dr. Salmanullah again to refill his medication.  His Celexa had run out three weeks prior to the appointment, but due to his occupation as a truck driver, he could not return for a refill earlier.  He did not call to get a refill from his location.  He showed no suicidal or homicidal ideation.  Dr. Salmanullah assessed bipolar disorder.  He increased plaintiff's dosage of Celexa from 30 mg per day to 40 mg per day.[5]  He also prescribed lithium, 150 mg three times per day for mood stabilization.[6]  (Tr. 280, 341.)

On December 20, 2006, plaintiff saw Dr. Salmanullah for a follow-up appointment.  Dr. Salmanullah noted "remarkable improvement," and that plaintiff was smiling in the office without any symptoms of anxiety.  He increased plaintiff's lithium dose to 300 mg three times per day, and continued him on 40 mg per day of Celexa.  (Tr. 279, 339.)

In January 2007, plaintiff was incarcerated due to failure to appear in court for writing a bad check.  He was scheduled to be released June 7.  On January 16, plaintiff underwent a psychological evaluation because he made threats of homicide and suicide.  He stated, "I wouldn't be suicidal if I had my meds."  Officials arranged for him to receive his prescribed medication.  (Tr. 294, 304, 308-12.)

On March 12, 2007, plaintiff underwent a psychological evaluation because he was sent to jail and fared poorly without his medication.  Debra Powell, MS, noted that plaintiff had suicidal thoughts, angry spells, sleep disturbance, and a depressed mood.  She noted that plaintiff had been in several foster homes as a child and had problems with comprehension and communication.  She marked that plaintiff lacked social judgment, personal judgment, and had assaultive ideas.  She diagnosed manic depression and bipolar disorder, and scheduled him for a medication management appointment.  (Tr. 289-301.)

---

[5] Although the record states that Dr. Salmanullah increased the Celexa dosage to "240 mg," the undersigned finds this to be a typographical error.  Later in December of 2006, Dr, Salmanullah planned for plaintiff to "continue his Celexa at 40 mg once a day." (Tr. 279.)  Further, the maximum dosage for Celexa is 40 mg.  WebMD, http://www.webmd.com/drugs (last visited on August 12, 2013).

[6] Lithium is used to treat manic-depressive (or bipolar) disorder by stabilizing mood and reducing extremes in behavior.  WebMD, http://www.webmd.com/drugs (last visited August 12, 2013).

Plaintiff underwent another mental evaluation while incarcerated on March 26, 2007. Plaintiff showed no progress, but expected therapy to help him control his anger and improve his personal relationships. Art Guetterman, MA, wrote that plaintiff's goals, particularly those of improving his relationship with his mother, may be unrealistic. (Tr. 307.)

Mr. Guetterman saw plaintiff again on April 18, 2007. Plaintiff again showed no progress. Plaintiff said he does not have angry episodes as long as he takes his medicine, though he also said he "wants to dig a hole and crawl in it forever." He felt his parents have forgotten about him. (Tr. 306.)

Mr Guetterman saw plaintiff again on May 2, 2007. Plaintiff again showed no progress. He discussed his upcoming appearance before a grand jury and the possibility of conviction. He stated that he was not guilty, but had become resigned to accepting conviction. (Tr. 305.)

On October 11, 2007, plaintiff underwent a psychiatric review technique review by Holly Weems, Psy.D. Dr. Weems determined that plaintiff had moderate difficulties in social functioning, and concentration, persistence, or pace. She found plaintiff suffered from major depressive disorder. Plaintiff had no difficulties with respect to daily living activities and had no repeated episodes of extended decompensation. Dr. Weems stated that he has not required inpatient treatment for any mental impairment in the last year, his medication helps him get good sleep and eliminates homicidal ideation. He needed reminders to take his medication, but he was able to prepare simple meals and perform light household chores. He did not like to be around people, but he talked to his friends on the computer and on the phone. Dr. Weems considered plaintiff's statements partially credible. She wrote, "He may perform best in an environment away from the general public." (Tr. 313-26.)

On October 22, 2007, plaintiff saw Jyoti Kulkarni, M.D., for a psychiatric follow-up examination. Dr. Kilkarni also diagnosed bipolar disorder. Plaintiff stated that Celexa no longer relieved his depressive symptoms. He denied suicidal or homicidal ideation. Dr. Kulkarni switched plaintiff's Celexa prescription to Prozac.[7] (Tr. 334.)

On December 6, 2007, plaintiff saw Jason Butler, FNP, for pain in his sides and a follow-up examination regarding Prozac. He could not tell that Prozac improved his mood. His mother

---

[7] Prozac is an antidepressant. WebMD, http://www.webmd.com/drugs (last visited August 12, 2013).

attended the interview and said he still had mood swings and negative thoughts about himself. Plaintiff expressed interest in seeing a psychiatrist. Mr. Butler referred plaintiff to a psychiatrist and scheduled plaintiff for a CAT scan for his abdominal pain. (Tr. 331-32.)

On December 10, 2007, plaintiff underwent a CAT scan of the abdomen. The examination was normal except for minimal thickening of the gallbladder wall. A sonogram was recommended. (Tr. 360.)

On January 17, 2008, plaintiff saw Karen Tracy, FNP-C, regarding pain in his left rib. Neither a CAT scan nor an ultrasound had revealed any abnormalities. He received a refill prescription for Trazodone.[8] (Tr. 328.)

On January 21, 2008, plaintiff underwent X-rays of his left ribs. The examination showed no radiographic evidence of fracture or bone destruction, but revealed minimal scoliosis. A bone scan revealed minimal osteoarthritis of the lower lumbar spine, and pyelocaliectasis of the left kidney.[9] (Tr. 358-59.)

On February 4, 2008, plaintiff saw Karen Tracy, FNP-C, to discuss X-ray results. Aside from the "possibility of a kidney stone", the X-rays were normal. A bone scan was negative for pathology. An ultrasound was scheduled, but Ms. Tracy explained the possibility that it would not reveal anything, and that he may simply have torn some cartilage, which would take some time to heal. (Tr. 433.)

On February 8, 2008, plaintiff underwent a sonogram and tomogram of the abdomen and Mahmoud Ziaee, M.D., interpreted them. The sonogram revealed no abnormalities. The tomogram revealed a "minimal spasm of the left ureter with increased trabeculation of the bladder. This could be [an] inflammatory process."[10] Everything else was normal. (Tr. 431-2.)

On March 7, 2008, plaintiff saw Ali Abdul Wahid, M.D., for pain in the upper left quadrant

---

[8] Trazodone is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on August 12, 2013).

[9] Pyelocaliectasis, or caliectasis, is dilation of the calices (part of the kidney), usually due to obstruction or infection. Stedman's Medical Dictionary 60520 (27th Ed. 2000).

[10] Trabeculation is the occurrence of trabeculae, or a meshwork of spongy bone, in the walls of an organ or part. Stedman's at 413660.

of his abdomen.  Dr. Wahid opined that the pain may be due to stomach wall tenderness.  He recommended a CT scan.  (Tr. 427.)

On July 18, 2008, plaintiff saw Naveed Mirza, M.D., for a psychiatric evaluation.  Plaintiff complained of anger problems, physical aggression, and mood swings.  He also stated that he heard voices and generally felt suspicious.  He grew upset in large crowds.  He denied thoughts of hurting himself or others but stated that his anger had become unmanageable.  Dr. Mirza gave plaintiff a GAF score of 45. He increased plaintiff's dose of Invega and started him on Depakote. [11] (Tr. 374-379.)

Plaintiff saw Dr. Mirza again on September 3, 2008 for a medication management session.  Plaintiff stated that he had been doing better since his lithium levels were lowered, but that he had an "episode" that morning. He stated that he "went stupid" and snapped on someone. Dr. Mirza's assessment included mild symptoms of depression, moderate symptoms of auditory hallucinations, paranoia, and panic attacks.  Plaintiff's eye contact was rated "fair." Dr. Mirza assessed schizoaffective disorder, intermittent explosive disorder, insomnia, and panic disorder.  He increased plaintiff's dose of Depakote, and advised plaintiff to continue with his other medications.  (Tr. 363-65.)

Plaintiff saw Dr. Mirza again on October 1, 2008.  Plaintiff stated that he had improved since his last visit.  He continued to be moody and upset, but he recovered quickly.  He felt his mind racing at times, but felt that "the voices are better than before" and presented with no new psychiatric symptoms.  Dr. Mirza lowered plaintiff's lithium dose and advised plaintiff to return in one month. (Tr. 371-73.)

On October 4, 2008, plaintiff saw Peter Somers, M.D., for respiratory issues.  He was diagnosed with asthma, and given Neti Pot and a nasal steroid.[12]  (Tr. 425-26, 457-58.)

Plaintiff saw Dr. Mirza again on November 03, 2008.  He had improved since his last visit,

---

[11] Invega is used to treat certain mental or mood disorders, including schizophrenia and schizoaffective disorder. WebMD, http://www.webmd.com/drugs (last visited on August 12, 2013). Depakote is used to treat seizure disorders, certain psychiatric conditions, including the manic phase of bipolar disorder, and to prevent migraine headaches. Id.

[12] Neti Pot is a ceramic pot used for nasal saline irrigation. WebMD, http://www.webmd.com/allergies/sinus-pain-pressure-11/neti-pots (last visited August 12, 2013).

and had not been getting upset. He stated that his mind still raced and he still heard voices. His eye contact was good. (Tr. 397, 406.)

On November 5, 2008, plaintiff saw Dr. Somers again for a follow-up examination regarding his asthma. Dr. Somers noted that plaintiff had not quit smoking. He prescribed a steroid inhaler to plaintiff. (Tr. 420-21, 452-53.)

On December 4, 2008, plaintiff saw Dr. Somers again. He had complied with his inhaler instructions and was much improved. Plaintiff continued to smoke but explained that he was trying to quit. Dr. Somers advised plaintiff to follow-up in three months. (Tr. 418-19, 450-51.)

Plaintiff saw Dr. Mirza again on December 08, 2008. Plaintiff still had his rage attacks. He stated that his sleep had been interrupted at times, but that he was fine with his meds "where they are right now." Dr. Mirza noted that plaintiff's depressed mood, decreased energy, and sense of hopelessness were "mild." He noted that plaintiff's hallucinations, paranoia, panic attacks, anxiety, and irritability were "moderate." (Tr. 400-01, 409-11.)

On December 19, 2008, plaintiff saw Karen Tracy, FCP-C, to discuss X-ray and ultrasound results. A bone scan showed some osteoporosis, but of an indeterminable degree. Plaintiff also sought a refill of Boniva,[13] but Ms. Tracy advised that plaintiff should wait until further results to determine more precisely the cause of plaintiff's pain. (Tr. 429.)

On January 7, 2009, Dr. Mirza noted that plaintiff had not changed, but that he does poorly around his family. Plaintiff stated that his father had been trying to upset him. Plaintiff remained suspicious of people, but denied any thoughts of hurting himself or others. His assessment was the same. Dr. Mirza increased his dose of Trazodone. (Tr. 403-05, 412-14.)

On March 4, 2009, plaintiff saw Dr. Mirza again for medication management. He denied new psychiatric symptoms. He stated that his mood swings come and go, and that he still had hallucinations. Dr. Mirza started plaintiff on Pristiq, and continued his other medications.[14] (Tr. 439-42.)

---

[13] Boniva is used to treat osteoporosis. WebMD, http://www.webmd.com/drugs (last visited August 12, 2013).

[14] Pristiq is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on August 12, 2013).

Plaintiff saw Dr. Mirza again on May 5, 2009. His condition had not changed. He sometimes neglected to take his medications. He reported that he had been living alone lately. He stated that he felt calmer, but still heard voices. (Tr. 468-70.)

On June 30, 2009, plaintiff saw Dr. Mirza for medical management. He stated that he still got angry and easily frustrated. He remained suspicious and stated that he "takes his medications when he remembers them." Dr. Mirza kept plaintiff on his current medications, but stressed the need for compliance. (Tr. 465-67.)

On August 24, 2009, plaintiff saw Dr. Mirza again. Plaintiff had been stable since his last visit, and feels better. He had moved to Fredericktown with his sister, and found that he was less angry when he stayed busy. He continued to have anger issues, but denied any thought of hurting himself or others. Dr. Mirza kept plaintiff on his current medications. (Tr. 462-64.)

On October 26, 2009, plaintiff saw Dr. Mirza again. Plaintiff stated that he feels overwhelmed in social situations, and that he still gets easily frustrated. In Dr. Mirza's assessment, he reduced plaintiff's symptoms of hallucinations, panic attacks, and irritability from "moderate" to "mild." (Tr. 459-61.)

On March 29, 2010, plaintiff saw Dr. Mirza again. Plaintiff had tried unsuccessfully to find a psychiatrist. He stated that he lived in the streets for some time following an argument with his sister. He had moved to Branson with his mother, which caused him stress. He mentioned that he was denied disability and that he would try again. Dr. Mirza increased plaintiff's dose of Trazodone to help him sleep, but otherwise kept him on the same medications. (Tr. 477-79.)

On April 26, 2010, plaintiff saw Dr. Mirza again. Plaintiff still had aggressive episodes, mostly toward his mother, and stated that his mother "still acts like she is 12 years old." He had been sleeping better. Dr. Mirza continued plaintiff on his present medications. (Tr. 474-76.)

On May 19, 2010, plaintiff saw Dr. Mirza again. Plaintiff stated that his anger issues and attitude problems had been worsening, that he had trouble forgiving people, and that he remained paranoid most of the time. Dr. Mirza continued plaintiff on his present medications. (471-73.)

**Testimony at the First Hearing**

A hearing was conducted before an ALJ on March 25, 2009. (Tr. 56-70.) Plaintiff was thirty-one years old, single, and living with his uncle. (Tr. 59-60.)

Plaintiff attended Dexter High School, but did not make it past the ninth grade. He received Ds and Fs in school. Plaintiff never earned a GED. He received a truck driving certificate in Saxton, and worked as a truck driver driving long hauls from 2000 to 2006. (Tr. 60-61.)

Plaintiff quit truck driving in 2006 because he "couldn't handle the stress." Plaintiff stated that he became indifferent to his own life and wanted to run other drivers off of the road or run off the road himself. (Tr. 61.)

Plaintiff sought treatment at Southeast Missouri Health Network. He began taking medication for depression and bipolar disorder. When he started seeing Dr. Mirza in 2008, he began taking medication for schizophrenia as well. He sees Dr. Mirza about once per month. Plaintiff's mental issues have neither improved nor worsened since 2006. Lithium produces no side effects. Although he does not notice that lithium improves his condition, it caused him to be more mellow, less irritable, an nonthreatening. Depakote, Invega, and Trazodone produce no side effects either. Plaintiff also takes Darvocet for his osteoarthritis, which affects his entire body. (Tr. 62-64.)

When plaintiff is seized with rage, he blacks out and starts "throwing stuff around." He makes threats, and has tried to physically harm someone without realizing it until afterwards. He still has homicidal and suicidal ideation. Plaintiff is not currently hallucinating; the Invega "somewhat" controls that. (Tr. 64-65.)

Plaintiff has also worked building grain bins, at a mill, and in restaurants. He cannot currently build grain bins due to the effect of grain dust on his asthma, but he could handle the exertional aspect of the job. He could not work at a restaurant because he is too slow; he "couldn't keep up" when he worked there before, and he lacks the requisite social skills. He fears he would hurt a customer. (Tr. 65-66.)

Plaintiff's depression keeps him from hunting, fishing, and spending time with people. He does not enjoy doing anything, and prefers to stay by himself. On a typical day, plaintiff wakes up at 10:00 or 11:00 a.m., and stays at home not doing anything. He does not require assistance bathing, clothing, or feeding himself. He buys his own groceries with food stamps, but avoids people in the

grocery store. He can cook for himself. Plaintiff does not visit friends or family aside from his father, whom plaintiff sees every day to every other day. (Tr. 66-67.)

Plaintiff has difficulty sitting for extended periods of time; he gets edgy and must move around constantly. He has no difficulty walking for long distances, standing for long periods of time, or lifting and carrying items. The worst condition he is currently coping with is his depression, bipolar disorder and schizophrenia. (Tr. 67-68.)

He checked himself into a health clinic in 1999 because he "had an episode." Plaintiff recalls, "I went and got the 12-gauge, put a shell in it, and was–stuck it to my aunt's head and was going to basically blow her brains out." (Tr. 68.)

Plaintiff has never used any street drugs. He was last gainfully employed in 2006. (Tr. 68-69.)

**Appeals Council Order**

The ALJ determined that plaintiff was not disabled on May 6, 2009. (Tr. 75-85.) Plaintiff requested an Appeals Council to review the hearing decision. (Tr. 125-26.) The Appeals Council reviewed the decision, and remanded back to the ALJ with instructions for a second hearing. (Tr. 86-90.)

The Appeals Council took issue with the ALJ's determination that plaintiff's residual functional capacity (RFC) was not limited by his osteoarthritis of the spine and recent onset asthma. It also found that the ALJ's determination that plaintiff could return to his past relevant work was contrary to his determination that plaintiff could not do "more than simple, repetitive unskilled or low level semi-skilled tasks, or having close or frequent contact with co-workers, supervisors or the general public." (Tr. 88.) It also found that the ALJ's conclusion that plaintiff "could perform work as a dipper, gluer, and house appliance patcher" was not supported in the record, and that the testimony of a vocational expert, subject to cross-examination, was necessary for such a conclusion. (Tr. 89.)

The Appeals Council remanded, stating that upon remand "the Administrative Law Judge will:" 1) give further consideration to plaintiff's RFC and provide a rationale with references in the record to support the conclusion; 2) "further evaluate plaintiff's mental impairments in accordance

with the special technique described in 20 C.F.R. 404.1520(a) and 416.920(a)", providing specific findings and rationales; 3) further evaluate plaintiff's past relevant work; and 4) "obtain evidence from a vocational expert to clarify the affect of the assessed limitations" on plaintiff's occupational opportunities. (Tr. 89.)

**Testimony at the Second Hearing**

A second hearing was conducted before an ALJ on July 15, 2010. (Tr. 28-55.) Plaintiff was thirty-three years old and single, and living with his mother in a house.

Plaintiff testified that when he sat for long periods or lifted anything heavy, he would pull a muscle in his back, and causes numbness in his left leg. His back pain was slowly worsening. He had been seeing Dr. Paul Geiger for his asthma and back pain. Dr. Geiger had taken X-rays and diagnosed plaintiff with degenerative disc disease. He also prescribed pain medication and muscle relaxers. He was referred to a surgeon for a surgical consultation in 2007, but could not make it to the appointment for financial reasons. Plaintiff takes several medications, including Balclofen for pain relief, which makes him drowsy and groggy, and Naproxen, a muscle relaxer, which has no side effects. (Tr. 31-33, 36-37, 54.)

The numbness in his left leg is moderate when he sits. When he stands, he feels a burning sensation in the leg. At its worst, the pain is a 5 or 6 out of 10. He has fallen twice because his legs have given out on him. His back pain has cyclically improved and worsened since November 2006, but has recently been worsening. (Tr. 34-35, 37.)

Plaintiff wakes up every day, eats, and showers. His physical pain does not affect these activities. Then he tries to do "something around the house to keep [his] mind occupied," like raking or other yard work. He does this for approximately 45 minutes. Then his back starts hurting and his leg starts burning, and he goes inside and lies down to try to ease the pain. He rests for about two hours. An outdoor activity such as raking causes back pain that rates an 8 out of 10. After resting for two hours, the pain is a 4 or 5. Because of pain, plaintiff cannot wash dishes. He can stand for 30 minutes comfortably, and can carry his three-year old niece across a room. After 30 minutes, his ankles and feet begin to burn. (Tr. 37-40.)

Plaintiff's asthma had neither improved nor worsened since the first hearing. (Tr. 41.)

Mentally, plaintiff testified that he had improved somewhat. He sees Dr. Mirza for his mental health issues, and Dr. Mirza has plaintiff taking Pristiq, Lithium, Depakote, and Invega. His schizoaffective disorder makes him uncomfortable in crowded places like Wal-Mart or Bass Pro Shop. He has panic attacks when he feels too crowded. His heart rate jumps, he has difficulty breathing, and he feels pressure on his chest. He goes to Wal Mart almost every day at his mother's insistence, because she believes that he requires constant supervision. He has a panic attack every time. He sits on the bench outside when he can and does not talk to anyone. (Tr. 42-45.)

He has also had several panic attacks while driving a truck. This is why he feels unsafe driving a truck. The Invega does not help plaintiff with his disorder. (Tr. 43.)

Plaintiff has also worked on a golf course, but he could not return to that type of work because it requires too much physical activity. (Tr. 43-44.)

Plaintiff had relocated recently because he got into an "altercation" with his sister, who told him to leave or she was going to have him put in jail. The quarrel was over transportation to his medical appointments, which he expected her to provide, and she did not. He now lives in a small bunk house behind his mother's house. His mother cooks and cleans for him. He sometimes makes himself soup or a sandwich. He spends approximately 90 percent of his day alone. (Tr. 46-48.)

He tries to avoid his mother, and his rage episodes are more frequent with his mother. He is also extremely concerned that people he doesn't know are making fun of him, that he is "their personal joke." He gets this feeling nearly every day, and it makes him want to slap the person, but he has never acted on the urge. (Tr. 49-50.)

Plaintiff explained that he cannot hunt anymore because no one trusts him with a gun. He had not been hunting in four to five years. He also likes fishing. He had gone a month earlier, but grew frustrated when he did not catch any fish and was "ready to throw [his] fishing poles off in the water and everything else with it." (Tr. 51-52.)

When inside his bunk house, plaintiff usually watches television and plays video games. He is alone most of his day and happiest when alone. He also cries about once a day for an hour or two and has done so since 2007. (Tr. 52.)

Plaintiff does not believe his medication controls his depression, rage, or paranoia, but he

takes his medication as prescribed. He uses his inhaler about once per hour in the summer due humidity. (Tr. 53.)

### III. DECISION OF THE ALJ

On October 4, 2010, the ALJ issued a second decision that plaintiff was not disabled. (Tr. 7-24.) At Step One of the prescribed regulatory decision-making scheme,[15] the ALJ determined that the plaintiff had not engaged in substantial gainful activity since November 24, 2006. At Step Two, the ALJ determined that the plaintiff had "impairments of psychiatric conditions variably diagnosed as different disorders" rising to the statutory requirements of severe impairments. (Tr. 14-15.)

At Step Three, the ALJ determined that the plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpar P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526). The ALJ noted while plaintiff did exhibit signs and symptoms of various disorders, they were often inconsistent. Plaintiff had no limitations in activities of daily living, moderate limitations in social functioning, and slight limitations in concentration, persistence, or pace. He had no episodes of decompensation within a year, each lasting for at least two weeks. The ALJ determined that plaintiff retained the maximum residual functional capacity to perform work at all exertional levels, though he can "no more than occasionally interact with the public, co-workers, and supervisors." The ALJ noted that examiners observed plaintiff to be pleasant and cooperative. (Tr. 15-16.)

At Step Four, the ALJ determined that plaintiff has residual functional capacity to perform his past relevant work as an over-the-road truck driver, as such an occupation did not require more than occasional interaction with the public, co-workers, or supervisors. Because the ALJ determined that plaintiff can perform past relevant work, plaintiff was determined not disabled, and the analysis did not proceed to Step Five. (Tr. 17.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by

---

[15] See below for a description of the required five-step regulatory decisionmaking framework.

substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in 1) not calling a vocational expert to testify at the second hearing, 2) finding that plaintiff could perform past relevant work, and 3) assuming in Step Four

determination of past relevant work that truck driving requires only occasional contact with the public.

**A. Necessity of Vocational Expert**

Plaintiff argues that the ALJ's failure to call a vocational expert to testify at the second hearing is reversible error because 1) the Appeals Council specifically directed the ALJ to have a vocational expert testify, and 2) the ALJ's determination that plaintiff could return to truck driving could only be supported by a vocational expert's testimony.

Defendant argues that the remand order makes clear that its direction to call a vocational expert "applies only if the ALJ proceeded to step five of the sequential evaluation process." (Doc. 18 at 5.) This is not the case. The remand order states that the ALJ *will* obtain evidence from a vocational expert, and will ask the expert specific examples of jobs appropriate for plaintiff that exist in the national economy. (Tr. 89.) None of its directives are conditional.

Plaintiff argues that the ALJ is obligated to follow an Appeals Council's direction. 20 C.F.R. § 404.977(b) states that the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." Further, "Social Security Rulings are binding on all components of the Administration." Carter v. Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990) (citing 20 C.F.R. § 422.408). Failure to adhere to the court or agency's remand order in the subsequent administrative proceedings is itself legal error. Thompson v. Barnhart, 2006 WL 709795 at *11 (E.D. Pa. 2006) (citing Hooper v. Heckler, 752 F.2d 83, 88 (4th Cir. 1985)).

Defendant argues that the ALJ is not obligated to call a vocational expert if he does not proceed to step five of the regulatory framework, citing 20 C.F.R. §§ 404.1520 and 416.920. 20 C.F.R. § 404.1520(a)(4)(v) states, "At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled." Defendant reaches the conclusion that a vocational expert was unnecessary with a logical argument: the ALJ was instructed to further evaluate past relevant work; if the ALJ determines properly that plaintiff can perform past relevant work, plaintiff, is not disabled, and the analysis is complete. There is some merit to defendant's position.

Tauber v. Barnhart, 438 F. Supp. 2d 1366, 1375-76 (N.D. Ga. 2006), suggests that defendant's mootness argument should fail. In Tauber, the Appeals Council remanded with instructions to further develop the record to determine if plaintiff could perform past relevant work because the ALJ did not discuss how plaintiff's limitations would affect her past relevant work. Specifically, plaintiff required a sit/stand option, but no evidence indicated whether her past relevant work as a store clerk, office clerk, and apartment lease manager would allow her such an option. In the post-remand decision, the ALJ did not even address the sit/stand option. The court found this to be legal error: "This Court construes the Appeals Council's remand order as requiring the consideration of the "sit/stand option," even if that consideration entailed the debunking thereof. As such . . . error has been committed." Id. at 1375-76.

In this case, the ALJ again did not call upon a vocational expert, but he did explain his reasons for not doing so. He found it unnecessary as plaintiff "provided sufficient information about his past relevant work that the undersigned could make a decision without vocational expert testimony." (Tr. 18.) By failing to follow the Appeals Council's instructions, the ALJ may have committed legal error. But that is not the focus of the present inquiry. Again, the court's role is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. In this case, the ALJ sidestepped the relevant legal requirements, but because the undersigned finds the ALJ's determination based upon the record as a whole, the error is not reversible error. Thus, the discussion turns to plaintiff's second argument for the necessity of a vocational expert–that the ALJ could not have found plaintiff able to return to his past relevant work without one.

Plaintiff explains that a vocational expert's testimony is not generally required at Step Four, but is "proper when substantial non-exertional impairments exist." (Doc. 13 at 5, citing Miles v. Barnhart, 374 F.3d 694, 700 (8th Cir. 2004.)) Plaintiff supports the propriety of expert testimony in this case by stating that a vocational expert may find that someone limited to only occasional contact with others could be a truck driver, "but that seems doubtful given that an over the road trucker has to deal with hundreds of other drivers every day." (Id.)

In his second decision which stands as the final decision of the Commissioner, the ALJ determined that plaintiff retained the ability to perform work at all exertional levels but could only

have occasional contact with the public, co-workers, or supervisors. (Tr. 11-17.) The Eighth Circuit has repeatedly held that vocational expert testimony is not required at Step Four. See, e.g., Lewis v. Barnhart, 353 F.3d 642, 648 (8th Cir. 2003); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996); Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994). This is so because at Step Four, the claimant still bears the burden of establishing that he *cannot* perform his prior work. Because the burden of persuasion shifts to the Commissioner only at Step Five, an ALJ is not required to produce evidence, including vocational expert testimony, that a claimant is not disabled unless the ALJ reaches Step Five. Therefore, plaintiff's argument that a vocational expert was necessary at Step Four is without merit.

**B. Residual Functional Capacity**

Plaintiff claims that the ALJ found plaintiff could do past relevant work despite the Appeals Council having "ruled in its remand order that he could do no such work." (Doc. 13 at 5.) However, the Appeals Council did not issue a "decision." Rather, it instructed the ALJ to further consider plaintiff's residual functional capacity and whether he could return to any past relevant work. (Tr. 89.)

The Appeals Council stated that the ALJ's findings regarding plaintiff's residual functional capacity–that plaintiff could only perform simple, repetitive unskilled or low level semi-skilled tasks–were incompatible with a finding that plaintiff could return to his work as a truck driver, which requires greater skill. (Tr. 88-89.) The Appeals Council instructed the ALJ to further evaluate plaintiff's residual functional capacity and whether he could return to past relevant work, which he did.

The ALJ considered examiners' observations that plaintiff was pleasant and cooperative, and interacted well enough with others to shop. (Tr. 228, 237, 306, 377, 383, 386, 397, 403.) He found plaintiff's statements about his symptoms credible and considered their impact on his residual functional capacity. (Tr. 16.) Treatment had stabilized his symptoms (Tr. 400-14), and he could perform work at all exertional levels. Thus, the ALJ's decision was based on substantial evidence.

### C. Past Relevant Work

Finally, plaintiff argues that the ALJ erred in his assumption that driving a truck requires only occasional interaction with the public, co-workers, and supervisors. (Doc. 13 at 6.) Plaintiff contends that no evidence supported the ALJ's assumption; the only question in the hearing that related to interaction with others was whether plaintiff supervised anyone as a truck driver. (He answered that he did not.)

The ALJ did, however, rely on substantial evidence to make a finding that plaintiff's position as a truck driver required only occasional interaction with others. In the "work history" segment of the disability report, plaintiff answered the question "What did you do all day?" for each of his truck driving positions. (Tr. 242-48.) He answered that he filled out log books and delivery papers on loads for five truck driving positions, and "drove dump truck to rock quarry and back to work site . . . mostly sit all day" on another. (Id.) Never did plaintiff mention working with or having contact with another person.

The ALJ may properly rely on plaintiff's own description of past work in determining the nature of that work. See Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004). The ALJ's reliance on plaintiff's statements is reasonable, consistent with the record, and based upon substantial evidence.

### VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgement Order is issued herewith.

    /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 12, 2013.